Per Curiam:
This case comes before the court on plaintiff’s exceptions to a recommended decision filed August 11, 1972, by former Trial Commissioner James F. Davis pursuant to Buie 134(h). The court has considered the case on the briefs and oral argument of counsel. Since the court agrees with the decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is not entitled to recover and the petition is dismissed.
OPINION 0E COMMISSIONER
Davis, Commissioner:
In 1963, the Navy tendered to plaintiff $300 as an incentive award pursuant to 5 U.S.C. § 2121 et seg. (1958) for contributions he made to the Polaris missile program while employed as an engineer at the Naval Ordnance Experimental Unit (NOEU). Plaintiff refused to accept the award, claiming it was inadequate. Administrative appeal ensued, but his request for a larger award was denied. He now brings suit under 28 U.S.C. § 1491, alleging that the award of $300 (as determined pursuant to administrative procedures under 5 U.S.C. § 2121 et seg.) was arbi *573 trary, capricious and not supported by substantial evidence; and that he is entitled to an award of $1,568,000. For reasons noted in ultimate findings 34-38 and the other accompanying findings of fact, I hold that plaintiff has shown no procedural irregularity below; that the $300 award is supported by substantial evidence and was not arbitrary or capricious; that plaintiff’s claim for additional compensation is without merit; and that, accordingly, plaintiff’s petition must- be dismissed.
Findings oe Fact
1. Plaintiff, Herman I. Shaller, brings this suit under the Government Employees Incentive Awards Act, 5 U.S.C. § 4501 et seq. (Supp. Ill, 1965-67). Jurisdiction is based on 28 U.S.C. § 1491 (1958). The petition was filed September 27, 1968.
2. In 1963, the Navy tendered to plaintiff an incentive award of $300 pursuant to 5 U.S.C. § 2121 et seq. (1958) (the predecessor statute to 5 U.S.C. §4501 et seq. (Supp. Ill, 1965-67) and pursuant to Navy Civilian Personnel Instruction 450 (NCPI 450). The tendered award was for “intangible” benefits realized by the Navy as a result of work performed by plaintiff in 1957 while employed by the Naval Ordnance Experimental Unit (NOEU), located in Silver Spring, Maryland. Plaintiff here claims that he is entitled to recover $1,568,000 based on alleged “tangible” benefits to defendant. Accordingly, he seeks to have the $300 incentive award overturned as being arbitrary, capricious and not supported by substantial evidence.
3. The pertinent sections of 5 U.S.C. § 2121 et seq. provide as follows:
§2121. Regulations governing award program; annual report to President.
The departmental awards program set forth in this chapter shall be carried out under such regulations and instructions as may be issued by the United States Civil Service Commission which shall annually report the results of the program, with related recommendations, to the President for transmittal to the Congress.
*574 § 2122. Definitions.
As used in this chapter, the term “department” means an executive department or independent agency in the executive branch of the Government, * * *
§ 2123. Awards.
(a) Departmental.
The head of each department is authorized to pay cash awards to, and to incur necessary expenses for the honorary recognition of, civilian officers and employees of the Government who by their suggestions, inventions, superior accomplishments, or other personal efforts contribute to the efficiency, economy, or other improvement of Government operations or who perform special acts or services in the public interest in connection with or related to their official employment.
* # * * *
(d) Cash awards.
A cash award under this section shall be in addition to the regular compensation of the recipient and the acceptance of such cash award shall constitute an agreement that the use by the Government of the United States or the municipal government of the District of Columbia of any idea, method or device for which the award is made shall not form the basis of a further claim of any nature upon the Government of the United States or the municipal government of the District of Columbia by the employee, his heirs, or assigns.
* * * * *
(g) Maximum monetary award.
A monetary award granted under this chapter shall not exceed $5,000, except that an award in excess of such amount but not in excess of $25,000 may be granted, with the approval of the Commission, in special cases in which the head of a department certifies to the Commission that the suggestion, invention, superior accomplishment, or other meritorious effort for which such award is proposed to be made is highly exceptional and unusually outstanding.
4. The present controversy centers around the development of a system for recovering Polaris test missiles without damage. The Polaris was the first ballistic missile developed by the United States capable of being launched underwater *575 from a submarine. The missile is launched in two steps. First, the missile is ejected from the submarine by a blast of compressed air acting on the tail of the missile with sufficient force to propel it above the surface of the water. Second, When the missile is out of the water, a rocket motor in the missile’s tail ignites to propel the missile to its target.
5. In the early development of Polaris, it was necessary to test the missile’s trajectory characteristics and structural properties during underwater launch and prior to rocket-motor ignition. In the summer of 1957, the Navy’s Special Projects Office (SPO) informally requested NOEU to study the feasibility of recovering test missiles without damage. Mr. Kupelian, Director of NOEU, assigned the task to N. Eafel, Chief of the Aerodynamics Structures and Mechanical Division. He and his staff, including plaintiff, began a feasibility study of methods of recovering Polaris test missiles. Plaintiff at that time was a mechanical engineer at NOEU.
6. On October 1, 1957, plaintiff submitted a two-page report, No. E4-0019 (hereafter the “019” report), outlining a suggestion for a nondamage recovery system for underwater-launch testing of Polaris missiles. The system consists of a cable attached at one end to the nose of the missile and at the other end to a counterweight suspended above the surface of the water from a tower. The cable is fed through a pulley arrangement at the top of the tower. As the missile exits from the launch tube, the counterweight descends, thereby removing slack from the cable. The counterweight is of sufficient mass to overcome the weight of cable to be reeled-in, plus the friction of the cable-pulley system. When the missile reaches apogee, or maximum height, a braking device restrains backward movement of the cable and holds the missile stationary. The report does not disclose the tower construction, means for supporting the tower in the water, or the type of braking device to be used.
The “019” report discloses curves illustrating the dynamics of missile and cable travel during the launch sequence based on calculations made by plaintiff, which, in turn, are based on Polaris data available to him at that time. Plaintiff as *576 sumed in deriving the curves that the missile would undergo constant acceleration until it exited from the launch tube. Thereafter, it would decelerate until it reached zero velocity a few feet above the surface of the water. Consequently, the dynamic movement of missile and cable, as illustrated by the curves in report “019,” can be summarized as follows: The launch tube is located 100 feet below the surface of the water. Prior to launch, there is no cable slack and the counterweight is suspended motionless. The missile is ejected from the launch tube at constant acceleration (linearly increasing velocity). The constant upward acceleration of the missile as it travels through the launch tube is approximately five times greater than the downward acceleration of gravity on the counterweight. Consequently, slack initially develops in the cable. At approximately 0.35 seconds after launch, the slack reaches a maximum of 10 feet and thereafter gradually is taken up. At 0.7 seconds after launch, the missile emerges from the launch tube, and between 0.7 and 0.8 seconds after launch, the slack is completely removed. For the remainder of the flight as the missile decelerates, it acts as a brake on the counterweight and the cable remains taut.
The pulley arrangement in plaintiff’s recovery system has a 5:1 reeve ratio. Thus, the counterweight travels only one-fifth the distance traveled by the missile and does not strike the water.
7. Plaintiff’s cable recovery system as disclosed in the “019” report, along with several other nondamage recovery systems, were incorporated in NOEU Report No. E4 — 0020 (hereafter the “020” report), entitled “Feasibility Study of Recovery of Polaris Test Vehicle,” dated November 8,1957. The “020” report was prepared by N. Crone and R. Chaplick, members of the NOEU staff assigned to study the nondamage recovery problem, who had been assigned the specific task of coordinating and writing a report on the results of the feasibility study.
The “020” report describes the cable recovery system in greater detail than the “019” report. For example, it states that for successful operation of the system, it must be assumed that: (1) the forces created by cable slack at the *577 beginning of the launch are negligible considering the large moment of inertia of the missile; (2) the tension on the cable during the latter part of missile flight (when the cable is taut) has a negligible effect on the tendency of the missile to topple or rotate; and (3) the apex of the trajectory would not exceed 50 feet above the water.
Further, the “020” report suggests as an alternative to plaintiff’s falling counterweight for reeling in cable, “a device similar to an aircraft arresting gear except that a pneumatic cylinder is used to expand the loops of cable pulling the end attached to the missile.” Apparently, this alternative was suggested during discussions among members of the study group, and plaintiff makes no claim that he suggested this idea. The report concludes by observing that:
The attached cable recovery system is * * * desirable because of its simplicity and low cost. This is contingent upon obtaining a trajectory apex consistently less than 50 feet above the water.
8. Plaintiff applied for and was granted a United States patent, No. 3,081,626, on his cable recovery system. The patent application, which was assigned to the Navy, was filed September 28, 1960, and the patent issued March 19, 1963. The patent discloses a cable recovery system similar to the system described in reports “019” and “020.” However, as described in the patent, the launcher is placed below the surface of the ground, rather than underwater, and the patent specification states that the launcher can be mounted to permit movement simulating actual seagoing ship conditions. Furthermore, the patent does not disclose any numerical data contained in reports “019” and “020.”
The patent application was initially classified “Confidential,” as were the NOEU reports. On March 6,1961, the application was declassified pursuant to a letter from the Navy patent counsel stating that the subject matter in the drawings, specification and claims was no longer classified. However, the NOEU reports (“019” and “020”) remained classified until shortly before trial in this court.
9. In the latter part of 1957, SPO forwarded the results of the NOEU feasibility study to the Naval Air Engineering *578 Facility (NAEF), located in Philadelphia, and informally requested NAEF to study the feasibility of a nondamage missile recovery system. The evidence suggests that NAEF was called upon for this task because the NQEU study had concluded that a cable recovery method was desirable; that one such cable recovery method was to use an aircraft arresting gear to reel in the cable; and that NAEF had considerable experience in designing aircraft arresting gear. During the next few months, several meetings were held among NAEF personnel to explore various recovery schemes.
On January 10, 1958, SPO officially assigned NAEF the task of completing the feasibility study and submitting a design proposal for a missile recovery system. The effort was assigned the name “Project Skyhook.”
10. The NAEF effort resulted in two reports prepared jointly by J. Heiliczer and M. Siegel, Nos. NAEF-ENG-6353, dated March 25, 1958, and NAEF-ENG-6371, dated August 1,1958. These reports, which total approximately 200 pages of textual material, tables, graphs, drawings, and mathematical equations, describe and analyze in considerable detail several versions of a cable recovery system. The Sky-hook recovery systems were designed to recover a missile launched from a land-based missile launcher, rather than an underwater launcher as used with the operational Polaris missile. Apparently, it was felt that the feasibility of a non-damage cable recovery system could more easily and effectively be determined by first testing a land-based recovery system, and then, after the system had proven feasible, developing a system for recovering underwater-launched missiles.
The systems described in the NAEF reports differ from plaintiff’s cable recovery system in the following material ways:
(a) A modified Navy aircraft arresting engine is used to reel in the cable. Basically, an arresting engine is a hydraulically- and pneumatically-operated device capable of reeling in or letting out cable in such a manner that the cable reeled in or let out can be carefully controlled.
(b) The cable is attached to a harness that fits over the *579 nose of the missile and is secured to hoisting lugs mounted at structurally-strong points on the sides of the missile.
(c) The missile is arrested gradually during its downward descent, rather -than at apogee, and it comes to rest a few feet above ground.
11. In late summer of 1958, a land-based missile recovery system, designated “Project Skycatch,” was constructed at the San Francisco Naval Shipyard, based on the results of the NAEF study. A modified Navy arresting engine was mounted atop a large bridge crane. Cables were reeved from the arresting engine, up two specially constructed towers, and down to the missile harness. The first successful tests were performed October 18, 1958. By March 1, 1963, there had been 125 test missile recoveries at the Skycatch facility.
12. As a followup to the Skyhook study, NAEF conducted a feasibility and design study, designated “Project Fishhook,” of a cable recovery system for underwater-launched missiles. This study resulted in a report, No. NAEF-ENG-6464 (the “6464” report), dated February 17,1959, prepared by J. Heiliczer and M. Siegel, coauthors of the Skyhook report, and W. Goon. The “6464” report, which consists of approximately 175 pages of textual material, tables, graphs, drawings, and mathematical equations, describes and analyzes the system in considerable detail. The recovery system so described differs from plaintiff’s counterweight recovery system in the following material respects:
(a) A cable is suspended from a tower mounted on a catamaran barge that floats on the water. In order to prevent the cable from becoming excessively taut or slack prior to launch by movement of the barge, a hydraulically-actuated “slack reducer” automatically maintains the cable tension within specified limits.
(b) A cable is attached to a harness that fits over the nose of the missile and is secured to hoisting lugs mounted at structurally-strong points along the sides of the missile. The portion of the harness that fits over the nose of the missile, called a “beany cap,” remains attached to the missile during the launch sequence and is pulled off by cable tension after the missile has broached the water. In this way, the *580 harness lies flat against the sides of the missile during launch and minimally affects missile flight.
(c) As in Project Skycatch, a modified Navy arresting engine reels in the cable and gradually arrests the missile during its downward descent.
In addition to the foregoing major differences 'between plaintiff’s system and the Fishhook system, the “6464” report analyzes several critical factors related to a cable recovery system for underwater launches not considered by plaintiff. Examples include the hydrodynamic effect of the cable system, missile trajectory alteration by the cable, cable-loading history during the launch sequence, barge motion, dynamic and structural effect of cable rotation on the missile, and the effect of tension waves traveling along the cable. Furthermore, the “6464” report considers several limitations placed on the recovery system in order to prevent interference with the flight of the missile. For example, the maximum allowable cable tension is 5,000 pounds prior to launch, 1,500 pounds at launch, and 2,000-2,500 pounds during the flight to apogee; and the maximum allowable cable slack is 8 feet during the entire missile flight.
13. In the first few months of 1959, a Fishhook cable recovery system based on the results of NAEF report “6464” was installed at San Clemente Island, off the coast of California. Cable recovery equipment was mounted on a large catamaran barge equipped with a 200-foot-high gantry tower. The first successful tests with a prototype Polaris missile were run May 1,1959. By March 1,1963, there had been 72 test-missile recoveries at the Fishhook facility.
14. The evidence establishes that the Navy’s Fishhook and Skycatch facilities are the only installations used by defendant for nondamage recovery of missiles by means of a cable attached to the missile.
15. Credible expert testimony at trial establishes that plaintiff’s proposed counterweight cable recovery system, as disclosed in the “019” report and plaintiff’s patent, would not satisfactorily recover a Polaris missile for the following reasons:
(a) Attaching the cable to the nose of the missile would *581 produce large bending moments that would alter the trajectory of the missile and produce undesirable structural stress in the missile.
(b) Arresting the missile at apogee would produce excessive tension in the missile, thereby causing structural damage.
(c) Eeeling in cable by gravity alone, even with several different counterweights, would not provide sufficient versatility to enable the cable to remain within specified slack and tension limits during the various phases of the launch sequence.
(d) The braking system would not produce sufficient friction between cable and pulleys to arrest the missile.
(e) After the counterweight had taken all slack out of the cable, it would impose excessive loading on the missile.
(f) There is no provision for mounting the tower at a water-based launch site, and no provision for automatically adjusting slack prior to launch as a result of tower movement in the water.
16. Credible testimony at trial establishes that Moses Siegel, the NAEF engineer primarily responsible for the development of the Skycatch and Fishhook recovery systems, had no knowledge of the results of the NOETT feasibility study and independently conceived a cable recovery system using an arresting engine. He and Joseph Auer, Jr., jointly filed a patent application on such a system July 28,1959, and U.S. Patent 3,053,479 issued September 11,1962. Neither of these inventors nor anyone else involved in the development of the Skycatch and Fishhook systems, except plaintiff, was considered for an incentive award.
17. Plaintiff’s incentive award was determined pursuant to NCPI 450, which was promulgated under 5 U.S.C. § 2121 et seq. (1958); Civil Service Regulations for Incentive Awards, ch. 1-4 of the Federal Personnel Manual; Department of Defense Directive 5120.15, dated November 24,1954; and Department of Defense Instruction 5120.16, dated August 22,1956. NCPI 450 was issued July 1960 and portions were subsequently revised June 20, 1961; August 4, 1961; September 21, 1961; July 20,1962; and November 19, 1962. *582 The pertinent sections relating to the administration of the Navy incentive awards program provide as follows:
1-3. THE NAVY INCENTIVE AWARDS PROGRAM.
* * * * 41
b. Incentive awards.
The program provides incentive awards (cash and/or honorary) which may be granted to an individual employee or to a group of employees for contributions which are either:
(1) Outside j ob responsibilities, or
(2) Within j ob responsibilities, provided the contribution is so superior that it warrants special recognition.
‡ £ * ‡ %
1-6. TYPES OF INCENTIVE AWARDS.
An incentive award is a cash and/or an honorary award granted to an employee or group of employees in recognition of an employee contribution which results in benefits to the Navy or to the Government.
a. Cash awards.
Cash awards from $10 through $25,000 may be granted in the Government-wide program under the following conditions:
(1) Cash awards from $10-$5000 may be approved within the Navy.
(2) Cash awards in excess of $5000, but not exceeding $25,000, must be approved by the Department of Defense and the Civil Service Commission.
1-7. DELEGATION OF AUTHORITY TO PAY CASH AWARDS.
The head of each executive department is authorized by Public Law 763, 83d Congress, to pay monetary awards not to exceed $5,000 for an employee contribution which benefits his department. The Secretary of Defense has delegated this authority to the Secretaries of the military departments. The Secretary of the Navy has delegated the authority to approve the payment of cash awards as follows:
*****
b. Departmental approval authority.
Chiefs of bureaus and offices * * * have the authority to approve the payments of awards (initial and additional), based on tangible and/or intangible benefits, that do not exceed $1,000, provided that not more than *583 $500 of the total award for any one contribution is based on intangible benefits. The above named officials may, at their discretion, redelegate all or any part of their award approval authority to field activities under their management control, subject to the limitation that not more than $300 of the total awards for any one contribution, approved by a field activity, may be based on intangible benefits. * * *
*****
2-3. DEPARTMENT OF THE NAVY.
* * * * *
b. The Secretary of the Navy has assigned to the Chief of Industrial Eolations the responsibility for the administration of the Navy Incentive Awards Program. *****
2-6. NAVY INCENTIVE AWARDS BOARD.
a. The Secretary of the Navy has established the Navy Incentive Awards Board to assist in the attainment of the objectives of the program. This Board is the final board of review on incentive award recommendations for employees of the Navy.
b. The membership of the Board is as follows:
(1) Chairman — Under Secretary of the Na/oy.
(2) Deputy Chairman — Chief of Industrial Eola-tions.
(3) Members — Chief, Navy Management Office, and the Chairmen of Incentive Awards Committees established for the following: Office of the Chief of Naval Operations; Bureau of Medicine and Surgery; Bureau of Naval Personnel; Bureau of Naval Weapons; Bureau of Ships; Bureau of Supplies and Accounts; Bureau of Yards and Docks; Headquarters, U.S. Marine Corps; Commander, Military Sea Transportation Service; Office of Naval Eeseareh; and the Executive Office ox the Secretary.
c. The Board will perform the following functions: *****
(5) Exercise final jurisdiction on requests for reconsideration which may arise in connection with the Navy program.
*****
4-12. AWARD ELIGIBILITY.
Awards may be granted to individuals or groups for contributions which are either outside job responsibilities, *584 or within job responsibilities but so superior as to warrant special recognition.
a. Determining the extent of job responsibilities. The local Incentive Awards Committee will determine whether a contribution is outside or within job responsibilities, and, if within, whether or not the contribution is sufficiently superior to warrant an award. To make this determination the Committee should consider performance requirements, position descriptions, supervisor statements, the authority necessary to put an improvement into operation, and other pertinent factors. The Committee will also seek advice from competent authorities when reviewing the contributions of doctors, lawyers, scientists, engineers, and others employed in highly specialized fields. This advice is necessary in order that the relationship between the contribution and the standards for the position may be accurately evaluated. The following questions are offered as a guide in assisting the Committee to make a determination:
(1) Are employees in like positions expected or required to develop similar improvements or to perform in a similar manner?
(2) Does the accomplishment or performance exceed that which is expected to the extent that it warrants award consideration? (In this connection, expected performance should not be confused with acceptable performance. It is not the intent of the program to award performance which merely exceeds the latter.)
$ * # ‡ *
b. Eligibility for outside application.
If an employee contribution is utilized outside of the originating activity, such use is generally considered outside of the employee’s job responsibilities and, therefore, may be used as a basis for awai'd consideration.
c. Originality of employee contributions.
Lack of originality in an employee contribution shall not in itself be used as a basis for denying an award. A contribution may be an outgrowth of on-the-job training, private educational endeavor, reading, previous employment experience, outside contracts, or, as is frequently the case, be untraceable as to the origin. The award determination should be based entirely on the usefulness of the contribution to the Government.
18. At the pertinent times in issue, the Bureau of Naval Weapons (BUWEPS) was the parent organization for *585 NOEU. Th© administrative body that initially determined the $300 award tendered to plaintiff was the BUWEPS Incentive Awards Committee (IAC). This committee was established pursuant to NCPI 450 § 2-10, which provides in pertinent part as follows:
2-10 INCENTIVE AWARDS COMMITTEE.
Heads of activities shall appoint Incentive Awards Committees to serve in an advisory capacity and to assist in the administration of the local incentive awards program. The Committee (or panels thereof) shall be composed of both military and civilian members.. The members shall be selected from among the operating staff so that the overall membership of the Committee shall represent adequate technical and administrative ability to evaluate all types of employee contributions. * * *
a. Committee responsibilities.
* * * The responsibilities of the Committee include the following:
*****
(2) Determining the value of the contribution in terms of tangible and intangible benefits.
*****
(4) Computing and recommending the amount of award, if any, to be granted.
*****
19. By letter dated April 19, 1963, BUWEPS Patent Counsel recommended to BUWEPS IAC that plaintiff be considered for an incentive award for his contributions to the Skycatch and Fishhook programs. Prior to acting on this recommendation, IAC sought and received information upon which to make a determination. Mr. S. Cooper of SPO recommended by letter dated May 5,1963, that no award be made because (a) plaintiff was only one member of the NOEU team that investigated several different nondamage recovery systems for missiles, (b) plaintiff’s proposed system only “approximated very generally” the Skycatch system, and (c) a NAEF team, headed by C. Mester and M. Siegel, was responsible for developing the operational Skycatch system which used an aircraft arresting engine rather than a counterweight. On the other hand, B. Sciascia of the BUWEPS Patent Division replied by letter dated August 8,1963, that *586 plaintiff provided the “basic inventive concept and broad general arrangement” for the Skycatch and Fishhook systems, whereas M. Siegel of NAEF developed a “refined and operationally desirable arrangement which embraces the basic concept proposed by Mr. Shaller.”
20. By letter dated August 30, 1963, IAC recommended that plaintiff be awarded $300 for “intangible local-exceptional” benefits realized by BUWEPS from plaintiff’s contribution to the Skycatch program. The committee enumerated facts on which its recommendation was based, such as the similarities between plaintiff’s idea and the recovery method used in the Skycatch system.
The amount of award was made pursuant to NCPI 450 § 5-6, which provides in pertinent part as follows:
5-6. AWARD SCALES FOR INTANGIBLE BENEFITS.
Cash awards based primarily upon intangible benefits will be determined in terms of the extent of application of the contribution, the significance of the contribution, and the importance of the programs affected. * * *
* * * * *
b. Award scale for other intangible benefits (including bureau-wide and Navy-wide application of safety improvements).
The guide given here is designed to give effect to the principle that the amount of cash award for each employee contribution should be determined on the basis of its particular benefit to the Government and the people. It is apparent that, because of the nature of intangible benefits, no guide can be so conclusive as to make the determination of appropriate awards an automatic and simple process. The final determination must still be arrived at by the application of informed judgment, which considers all influencing factors, such as the relative importance of programs affected, seriousness of problems solved, duration of benefits, and the degree to which the employee contribution exceeds normal job expectancy.
Section 5-6 contains an award table based on the degree of benefit and extent of application of the contribution. An “exceptional” degree of benefit is the highest possible benefit and is defined as “an initiation of a new principle or major proce *587 dure; or superior performance of tasks, or other acts or services, which materially affect major programs such as a contribution which substantially advances an important activity of the Department or makes a significant contribution to scientific knowledge.” A “local” extent of application “affects activity-wide operations and/or a substantial number of people or their work, within the activity; or is in the public interest only in the locality.” More extensive applications providing for higher awards are “extended,” “broad” and “general,” defined as follows:
Extended — Applicable to several major activities or a large number of small activities and affects a substantial number of people in its application; has extremely wide application covering an entire Department or number of Departments or Agencies but has only very limited use or affects only a very small number of people in each instance of application; or is in the public interest in several localities or in a region.
Broad — Applicable to many activities, installations, or facilities and affects a large number of people in its application; has extremely wide application covering an entire Department or a number of Departments and Agencies but has only moderate use or affects only a moderate number of people in each instance of application; or is in the public interest in several regions.
General — Applicable and extensively used throughout a large Department or a number of Departments and Agencies and affects a large number of employees in each instance of application; or is in the public interest throughout the Nation or beyond.
The range of award for a “local-exceptional” intangible benefit is $100-300; for “extended-exceptional” is $200-450; for “broad-exceptional” is $100-750; and for “general-exceptional” is $750-up.
21. On November 29,1963, plaintiff wrote the Navy Chief of Industrial Relations (CIR) expressing his disagreement with the award recommended by IAC and requesting a hearing and reconsideration by the Navy Incentive Awards Board (NIAB). The CIR construed plaintiff’s letter as a request for reconsideration of the incentive award and referred *588 plaintiff’s claim to BTTWEPS pursuant to NCPI450 § 4-13, which provides in pertinent part as follows:
4-13. REQUESTS FOR RECONSIDERATION AND exceptions.
¡¡t * * * *
a. Requests for reconsideration.
A suggester, or a person initiating a superior accomplishment award recommendation may request a reconsideration of a decision involving an interpretation or application of this Instruction, the merits and values of an employee contribution, or the eligibility of an employee to receive an award. Such a request must be in writing, must contain the justification or basis for the request, and must be submitted to the local incentive awards office within 30 days after the receipt of the decision which prompted the request. Upon receipt of the request, it shall be reviewed to determine whether a discussion with the employee would be of any value in resolving the request. Frequently, such a discussion, explaining or clarifying the decision, will resolve the request without further action. However, if a discussion would serve no useful purpose or if the discussion does not resolve the issue to the satisfaction of the employee, the action necessary to resolve the request will be taken. This action may require a further review by local management or it may require a review and decision by a higher authority. In any event, the request should be acted upon at the lowest level of management which will ensure an authoritative, complete, and impartial consideration of the case. Requests for reconsideration will be processed as follows:
3: * * * *
(2) Requests for reconsideration involving the merits and values of an employee contribution, or the eligibility of an employee to receive an award will be reviewed ana resolved at the management level vested with the authority to decide the points at issue in the request. The majority of these requests involve matters under the control of the local command; therefore, the final decision on such requests can be rendered by the head of the activity. In a small percentage of the cases it may be necessary to refer the requests elsewhere for review.
% ‡ # ‡ Ht
22. (a) On December 18, 1963, the Chief of BUWEPS wrote plaintiff requesting him to specify any errors, omissions, misunderstandings, or inconsistencies plaintiff thought *589 were contained in the IAC award recommendation. Plaintiff replied the same day, alleging that the award determination (1) did not consider benefits resulting from the Fishhook program, (2) did not consider tangible monetary savings to defendant from the Skycatch and Fishhook programs, (3) did not take cognizance of the fact that the Skycatch and Fishhook systems were the first systems for recovery of a launched missile without damage, and (4) obscured the fact that plaintiff provided the basic inventive concept and broad general arrangement of Skycatch and Fishhook. Furthermore, plaintiff claimed that his contribution resulted in a savings of $300,000,000 to defendant based on the first 4 years of operation of Skycatch and Fishhook, and that he was entitled to separate $25,000 awards for 1 year of operation of Skycatch and Fishhook.
(b) By letter dated December 4,1963, plaintiff advised the Chief, BUWEPS, that he would return the $300 incentive award check. On March 1,1964, plaintiff returned the check to the Naval Eesearch Laboratory, his employer organization which had issued the check at the direction of BUWEPS.
23. On February 6,1964, BUWEPS advised plaintiff that his award determination had been reconsidered in light of additional information obtained from technical personnel of SPO, BUWEPS and NOEU. It was concluded that the inventive concepts and broad general arrangement of the Sky-catch and Fishhook systems resulted from the efforts of many persons, and that an award of $300 to plaintiff was appropriate in recognition of his participation in the original NOEU feasibility study.
The additional information obtained by BUWEPS included a letter from N. Crons and N. K-afel of NOEU outlining the history of the NOEU recovery system feasibility study. They stated that plaintiff was one of several people at NOEU who disclosed various posáble recovery systems, and that plaintiff’s contribution was a “mathematical analysis” of a counterweight, cable recovery system. They further stated that although this analysis was probably not specifically requested of plaintiff, he was a member of the staff assigned to investigate missile recovery systems.
*590 The director of SPO also furnished, information and. comments to BUWEPS regarding the background, of the Polaris recovery program. He recommended that plaintiff not be given an additional award because there was never any intention to expend the money plaintiff claimed to have saved defendant, and the broad general arrangement of the Polaris recovery system was probably not attributable to any single person.
24. On February 14,1964, plaintiff wrote the CIR requesting reconsideration of his case and a hearing by the NIAB. On April 2, 1964, CIR replied that plaintiff’s case had been fully considered and reconsidered by BUWEPS; 'that such action fully complied with the requirements of NCPI 450 § 4r-13a(2); and that such section did not provide for a hearing. (Finding 23.)
25. On April 18, 1964, plaintiff wrote to the Secretary of the Navy requesting his assistance in resolving plaintiff’s case. In response, the Assistant Secretary of the Navy for Research and Development wrote the Chief of Naval Material on April 22,1964, requesting an investigation and hearing for plaintiff. On June 12, 1964, the Deputy Chief of Naval Material (Management and Organization) replied that plaintiff had exhausted the Navy procedures for adjudicating incentive award claims. He stated that NCPI 450 provided that award eligibility be reviewed only at the management level vested with authority to decided the issues, apparently referring to §4-13a(2). (Finding 23.) Therefore, he construed plaintiff’s letter to the Secretary of the Navy as a “personal request for reconsideration at a level above that provided under current regulations.” He then recommended that plaintiff’s case be referred to NIAB for further consideration.
26. NIAB then referred plaintiff’s case to the Navy Distinguished Civilian Service Awards Panel (DCSAP) pursuant to the following pertinent provisions from the guidelines regulating the operation of NIAB:
8. NIAB Panels
The NIAB may establish special panels to assist in performing the work of the Board, a. DOS A Panel
The DCSA Panel, as a special panel of NIAB, shall have complete authority to act for the *591 Board on all cases referred to it for consideration. The Panel shall report to NIAB on all actions taken by the Panel. The membership, quorum, voting, and duties of the Panel are defined as follows:
(1) Membership
(a) Chairman
The Deputy Chairman of the NIAB
(b) Two members designated by the Chairman or Deputy Chairman of the NIAB
(c) Executive Secretary
Executive Secretary of the NIAB (Non-voting member)
(2) Quorum
Full membership shall be necessary to constitute a quorum.
(3) Voting
A unanimous vote of the Panel membership shall be required to approve an award recommendation presented to the Panel for consideration.
(4) Duties
The Panel shall meet upon the call of the Chairman to consider and act upon the following types of award recommendations:
(a) Recommendations for the Distinguished. Civilian Service Award.
(b) Recommendations which involve cash awards coupled with the DCSA.
(c) All award recommendations involving employee contributions which contain classified material.
(d) Recommendations for non-Navy awards.
The evidence establishes that DCSAP was assigned plaintiff’s case because, under § 8a (4) (c) of the NIAB guidelines (above-recited), one of the duties of DCSAP was to act upon “award recommendations involving employes contributions which contain classified material.” NOEU reports “019” and “020” were classified at that time.
27. On November 9, 1964, DCSAP heard plaintiff’s case. The evidence establishes that plaintiff made a comprehensive presentation of his views and that there was a full and free exchange of questions and answers between plaintiff and the *592 Panel. On November 20, 1964, DCSAP notified the Under Secretary of the Navy as follows:
After consideration of all the factors involved, the Panel finds that the award of $300 already approved by the Bureau of Naval Weapons is ample recognition for Mr. Shaller’s contribution in this instance.
An internal Panel memorandum states that the Panel’s decision was unanimous and was arrived at by placing heavy emphasis on the following points:
(a) SPO used a number of sources for obtaining solutions to the recovery problem.
(b) SPO assigned the project of studying nondamage missile recovery systems to NOEU and it was reasonable to expect that NOEU would provide solutions to the x’ecovery problem.
(c) Plaintiff, as a member of the NOEU study group, did make a contribution to the recovery proposals submitted to SPO and was entitled to an award. However, the cable recovery system he suggested was an application of well-known principles to this type of problem and his performance was expected from employees in the field.
On November 25, 1964, the Under Secretary of the Navy notified plaintiff of the DCSAP determination.
28. On February 5, 1965, plaintiff wrote Admiral E. Moore, the CIE and also chairman of DCSAP, requesting an explanation of the basis of the Panel’s decision, and specifically, an explanation of the Panel’s determination that there were no tangible benefits resulting from the plaintiff’s contribution. On February 19, 1965, Admiral Moore replied in part as follows:
2. The Navy Incentive Awards Board was well aware that tangible benefits did result from the use of the non-damage missile recovery system when compared to other methods used in the past. This was inherent in the plans of the Special Projects Office to pursue a program of launching and recovering test missiles without damage. However, the Board determined that these benefits should not be used as a basis for determining an award for your contribution to the development of the system. This determination was based in part on the fact that the Special Projects Office concluded that the required *593 engineering talent to develop a nondamage missile recovery system was available and the test program was planned accordingly. It was also evident from the information contained in the case file and from your presentation at the Board meeting that no single individual was totally and exclusively responsible for the benefits derived from the recovery system which was finally developed and used but rather that this system represented ideas contributed by a number of persons at the departmental level and in the field. The Board determined further that the personnel assigned to this task were expected to develop solutions to the problems concerning nondamage recovery of missiles and that your contribution, one of several embodied in the system, was in that category. In this connection, the Board noted that except for the award granted you, no other employee received an award for his contributions to the development of the system.
29. On March 13,1965, plaintiff wrote Admiral Moore requesting that the amount of award be increased in view of the tangible benefits that resulted from the Skycatch and Fishhook programs. Plaintiff alleged that these tangible benefits, in turn, resulted from his contributions. Admiral Moore replied on March 19, 1965, that plaintiff’s request for additional award was given full and fair consideration by NIAB and that its determination was final.
30. Plaintiff alleges that he was considered for a “Presidential” award according to a letter dated February 18,1966, from the Assistant Secretary of the Navy to Paul H. Bobbins of the National Society of Professional Engineers. However, this letter clearly indicates that plaintiff was considered only for an “Agency” award. The letter states in pertinent part as follows:
The President has asked me to reply to your letter of January 31,1966.
Your comments and views concerning the Navy’s general participation in the Incentive Awards Program and Mr. Herman I. Shaller’s case in particular are appreciated. As you have pointed out in your letter, Mr. Shaller’s case has received a thorough and exhaustive review within the Department of the Navy. Accordingly, it is not felt that further consideration of the appropriateness of Mr. Shaller’s award is warranted.
*594 I cannot agree that there is a lack of uniformity in the Navy’s participation in the Incentive Awards Program. The amount of savings realized by the Government is only one of the many applicable criteria which are involved in determining incentive awards. Eligibility and job expectancy are other important standards which are considered. It is, therefore, the application of all of these criteria, which must be exercised with uniformity, and you may be assured that the Department of the Navy will continue to make every effort to see to it that such a standard prevails.
Furthermore, all other evidence introduced at trial establishes that plaintiff was considered only for an “Agency” award.
31. Plaintiff alleges that his contribution resulted in savings to defendant of $1,566,950,000, computed as follows:
(a) Defendant admits that between January 1958 and August 1968, it used the Skycatch system 263 times and the Fishhook system 144 times, for a total of 407 missile recoveries. This figure includes 197 recoveries of Polaris missiles, using both systems, between October 1958 (when the first successful tests of the Skycatch system were conducted) and March 1963 (when plaintiff first requested an incentive award); and recoveries of the Poseidon and Sprint missiles.
(b) Defendant admits that the cost of a fully instrumented Polaris or Poseidon test missile is $1,100,000.
(c) Plaintiff alleges that a nondamage recovery of a test missile produces savings greater than the cost of the missile, and estimates this saving to be 3.5 times the cost of the missile. This estimate is based on plaintiff’s assumption (unsupported by the record) that the total loss resulting from a nonrecoverable test-firing of a missile includes not only the cost of the missile itself but also the cost of nonrecoverable instrumentation associated with the missile, including the cost of developing such instrumentation.
(d) Therefore, the total savings, as alleged by plaintiff, would be computed as:
3.5 x 407 x $1,100,000=$1,568,950,000.
32. Plaintiff alleges that the savings described in finding 31 are tangible benefits to defendant and that, therefore, his *595 incentive award should be determined under NCPI 450 § 5-5, “Award Scale for Tangible Benefits.” Section 5-5 provides that if the savings are more than $1,000,001, the amount of award is $1,150 for the first $100,000 savings, plus $5 for each additional $5,000 savings or fraction thereof. Thus, the amount of award computed by plaintiff is:
(1) $1,566,950,000
-100,000
$1,566,850,000
(2) $1,566,850,000X g|óó+$l,150=$l,568,000
33. (a) Plaintiff’s claim for award is based on use of the Skycatch and Fishhook systems by defendant for more than 10 years, despite NCPI 450 § 5-4, which provides in pertinent part as follows:
5-4. DETERMINING THE AMOUNT OP A CASH AWARD.
The amount of a cash award to be granted for an employee contribution is determined by applying the award scales in this section to the dollar benefits and/or intangible benefits which will accrue during the first full year that a suggestion is in operation * * * [emphasis added].
* * * * *
b. Computation of dollar benefits.
Dollar benefits resulting from employee contributions are computed on the basis of the estimated net savings for the first full year that the contribution is in actual operation. In determining net savings, however, care should be exercised so that only savings involving labor, materials, and/or the cost of services are included. Predetermined or prorated overhead or burden costs should not be included in the computation of savings. * * *
Furthermore, the evidence establishes that although it was recognized at the inception of the Polaris program that many test firings would be necessary to adequately test the missile, the program was funded for only four Polaris structural test vehicles.
(b) Plaintiff’s allegations and computations set out in findings 31-33 (a) are irrelevant, insofar as they seek an award *596 greater than $25,000, since 5 U.S.C. § 2123 (g) and. 5 U.S.C. § 4502(a) and (b) expressly limit incentive awards to a maximum of $25,000 for either “Agency” or “Presidential” awards. Accordingly, the maximum incentive award which may be granted under the statutes is $50,000 (a $25,000 “Agency” award and a $25,000 “Presidential” award); and since plaintiff was never considered for a “Presidential” award, the maximum award under the statute to which he could be entitled is $25,000.
Ultimate Findings and Conclusions
34. Under incentive awards legislation (particularly 5 U.S.C. § 4501 et seq. and its predecessor statute, 5 U.S.C. § 2121 et seq.), heads of Government agencies have discretion to make or not make awards, and to tailor the awards as they see fit in accordance with administrative regulations. The courts will not upset agency determinations except for a clear showing of abuse of discretion. Martilla v. United States, 118 Ct. Cl. 177 (1950); Kempinski v. United States, 164 Ct. Cl. 451 (1964), cert. denied, 377 U.S. 981; Serbin v. United States, 168 Ct. Cl. 934 (1964).
35. Plaintiff has not shown that he was denied any procedural rights under the Navy’s regulations implementing 5 U.S.C. § 2121 et seq. or 5 U.S.C. § 4501 et seq. Plaintiff was accorded full consideration in the first instance by the BUWEPS Incentive Awards Committee (findings 17-20) and, upon request, was granted reconsideration by such committee. (Findings 21-23.) Thereafter, upon further request by plaintiff, he received additional consideration (including a hearing) from the Distinguished Civilian Service Awards Panel (DCSAP), a panel of the Navy Incentive Awards Board (NIAB), duly constituted under the Navy incentive awards regulations. (Findings 25-29.) Consideration by DCSAP, though afforded plaintiff, was not required by the Navy’s regulations. (Finding 25.) Plaintiff was never considered for a “Presidential” award pursuant to 5 U.S.C. § 4504. (Finding 30.)
36. Plaintiff has not shown that the Navy abused its dis *597 cretion in tendering to him an award of $300 for “intangible” benefits based on his contribution to the Skycatch and Fishhook systems. The Navy’s decision to award plaintiff for “intangible” benefits and not for “tangible” benefits was not arbitrary, capricious or unsupported by substantial evidence because (a) plaintiff’s contribution was but part of a large number of contributions going to make up a complex and detailed system, (b) plaintiff’s contribution and ideas were substantially modified by others in arriving at a practical and workable system, and (c) plaintiff’s proposed system, using a counterweight, was not feasible, was never used, and contributed only in a general way to the ultimate development of the cable recovery systems. (Findings 6, 7, 9-13, 15, 16.) While the Skycatch and Fishhook systems, as finally designed, built and used, no doubt resulted in tangible savings to the Government, plaintiff’s contribution to such systems provided a basis only for an award of “intangible” benefits, and it was within the Navy’s sound discretion to so determine. The Navy made no incentive awards to anyone for “tangible” benefits derived from the Skycatch and Fishhook programs, a decision which was fully within the Navy’s discretion in view of the number of persons and naval activities participating in the ultimate design, construction and use of Skycatch and Fishhook facilities. (Finding 16.)
37. Plaintiff has not shown that the award of “intangible” benefits based on the criteria of “local” was arbitrary, capricious or not supported by substantial evidence. The administrative record, as well as evidence at trial, shows that the Skycatch and Fishhook systems were used at only two Navy installations (finding 14), and it was reasonable and not an abuse of discretion to conclude, pursuant to the regulations defining “intangible” benefits, that such use was “local.” (Finding 20.)
38. Plaintiff was never considered for a “Presidential” award (finding 30), and the maximum “Agency” award under the statute authorizing incentive awards is $25,000. (Finding 33(b).) Therefore, plaintiff in no event would be entitled to an award of $1,568,000, as alleged. (Findings 31-33 (a).)
*598 CONCLUSION OK 'LAW
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.