**The B. F. GOODRICH COMPANY**

v.

**The UNITED STATES.**

**No. 328–66.**

United States Court of Claims.
July 17, 1968.

Harold J. Fast, attorney of record, for plaintiff.

Edgar H. Twine, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

COLLINS, Judge.

This case is before the court on cross-motions for summary judgment. The facts are not in dispute.

On March 18, 1963, plaintiff was awarded contract No. AF33 (657) 10560 for the manufacture of a quantity of brake and wheel adjuster assemblies with separate parts and data at a price of $230,849.50. The contract, however,

stipulated that its effective date was January 18, 1963. Plaintiff had signed the contract on February 27, 1963, although there obviously had been negotiations between the parties for some time before then. The contract was made on behalf of the Government by the Aeronautical Systems Division, Wright-Patterson Air Force Base, Ohio. Delivery was to be completed by December 31, 1963.

Sometime before December 26, 1962, while negotiations were still going on between the parties and prior to the award of the contract, plaintiff received a telephone call from an official at the Hill Air Force Base, Ogden, Utah, a future consignee of some of the material to be manufactured under the proposed contract. This official asked plaintiff to study the possibility of modifying the heat shield of the assemblies so as to allow removal of certain tie bolts without removing the heat shield. This change involved semicircular slots for the bolts and thicker material for stability of the heat shield assembly. The record does not show what was said in that phone conversation. The correspondence between the parties indicates that the Hill Air Force Base official requested data on how his suggested modification of the heat shield would affect its structural stability. On January 25, 1963, Hill Air Force Base was notified by plaintiff that the proposal was practicable, and that a prototype was being manufactured. On March 20, 1963, plaintiff forwarded to Hill Air Force Base a drawing incorporating various modifications of the heat shield. Plaintiff asked defendant to review the drawing since plaintiff desired to include the modified heat shield on all new wheel assemblies. On April 16, 1963, Hill Air Force Base approved the drawing with the recommendation that the revision be included in all future procurement.

Plaintiff incorporated this revision in the units manufactured and delivered under this contract, and the units were accepted and paid for by defendant. Of the 1,373 assemblies called for in the contract, 1,349 were finally accepted prior to November 29, 1963. Seventeen of the remaining 24 assemblies were accepted on January 9, 1964, and 7 on January 31, 1964. The final payment to plaintiff under the contract was made April 14, 1964.

By letter dated January 8, 1964, the contracting officer advised plaintiff that the revision had "resulted in a cost savings," of which the Government was entitled to a 50-percent share under the Value Engineering Incentive clause.[1] That letter read as follows:

1. The revision of Part No. 72–155 and incorporation of Part No. 72–155–1 in Part No. 3–945, Wheel Assembly for the T–38 aircraft, resulted in a cost savings in the 825 units concerned on subject contract. In accordance with the Value Engineering Clause in AF–10650, this savings shall

---

[1]. Article 48, the "Value Engineering Incentive" clause, reads as follows:

"(a) This clause applies to any proposal initiated and developed by the Contractor for variation from contractual requirements which, to be acceptable under the contract, would necessitate issuance of a contractual change, and which reduces the cost of performing the contract, without degrading operational functions; e. g., performance, reliability, or maintainability of the item. Such proposals will be submitted to the Government in the same form as prescribed for any other proposal which would likewise necessitate a change in contractual requirements, but will include a statement that they are subject to the operation of this clause. The Government shall not be obligated to accept such proposals and nonacceptance shall not be a cause for dispute under the 'Disputes' clause of the contract.

"(b) As an incentive for the Contractor to submit proposals, as described in paragraph (a) above, during the life of this contract, the parties agree that if the Government accepts and incorporates any such proposal into the contract, the contract price shall be reduced by an amount equal to 50 percent of the amount agreed to be the estimated reduction in cost that will result from incorporation of the proposal into the contract."

be shared at a rate of 50% by the contractor and the Government.

2. It is therefore requested that the contractor submit information to the Government indicating the amount of savings involved, and the amount proposed to be credited to the Government. Your response is requested immediately in order to prevent further delay of the contemplated amendment to this contract.

Plaintiff contested defendant's claim for 50 percent of the savings, pointing out that, since the modification had been initiated by the Government, and not by plaintiff, the Value Engineering Incentive clause (provision 48) did not apply.

The parties maintained their positions in further correspondence. On May 22, 1964, the contracting officer wrote plaintiff a letter stating, in part, that "[t]he change in part number of a heat shield, a class I change, under this contract should have been accomplished under Engineering Change proposal provisions * * *. Approval of the new heat shield by Ogden Air Materiel Area did not constitute proper authorization to make this change." The contracting officer still insisted that no change order could have been made, and he again attempted to invoke clause 48, asking that 50 percent of the savings be paid to the Government.

On July 22, 1964, the contracting officer wrote to plaintiff that, "[a]pproval of the new heat shield by Ogden Air Materiel Area did not constitute proper authorization to make this change." He further stated, however, that "[t]he change as directed has been approved by the Contracting Officer. The change thus approved appears to have resulted in decreased cost of performing the contract and therefore, under the Changes clause of the contract, a downward equitable adjustment is due the government." The contracting officer also requested plaintiff to "submit within thirty days your proposal for the equitable adjustment to which the government is entitled." This was his first suggestion for an adjustment under the Changes clause.

On September 22, 1964, the contracting officer entered his "final decision" on plaintiff's claim. In that decision, he stated that "[a]pproval of the new heat shield by Ogden Air Materiel Area did not constitute proper authorization" to make the change. Then the decision continued:

* * * Under the provisions of the Changes Clause the Contracting Officer determines that the Government is entitled to an equitable adjustment by way of adjustment in contract price in the amount of $14,-908. As a result the Contractor has been overpaid on subject contract in the amount of $14,908, demand for which is hereby made.

Plaintiff then filed an appeal with the Armed Services Board of Contract Appeals, which rendered its decision on June 15, 1965. ASBCA No. 10373, 65–2 BCA ¶ 4910. That opinion concluded:

We agree with the appellant that this modification was not within the Value Engineering Incentive clause of this contract. * * * [T]he modification was in fact originally initiated by the Government, although the actual format of its development came from the appellant.

After the modification had been approved by the Government, it was incorporated in the units manufactured for this contract. It does not appear who determined that this should be done, but they were so accepted and paid for at the contract price. The contracting officer has never rejected them or objected to them. This constitutes an acceptance of a deviation. It is well established that this constitutes a change under the Changes article, and that an equitable adjustment may be made in the contract price for the increase or decrease in costs thereby incurred. No question has been raised as to the amount of the claim. It is therefore our conclusion

that the Government is entitled to an equitable adjustment for the entire cost reduction of $14,908.00. Appellant is, however, entitled to a credit against this amount for its costs of $317.49.

The appeal is accordingly sustained in the amount of $317.49, and otherwise denied.

Thus, the Board held that $14,590.51 was due the Government from plaintiff. Plaintiff repaid this amount, reserving its right to appeal this decision. Plaintiff then filed its claim in this court on February 6, 1967.

We are unable to agree with the Board's interpretation of the Value Engineering Incentive clause (article 48). We hold that plaintiff is entitled to recover one-half of the cost savings under that clause.

It is undisputed that plaintiff developed the proposal. However, article 48 applies to proposals *"initiated* and developed" by the contractor, and the Board was of the opinion that the Government had initiated the proposal in this case. The Board was in error for two reasons.

■ In the first place, even if the word "initiated" is interpreted very narrowly, any action by defendant that could be construed as "initiating" the proposal took place prior to both the award and the effective date of the contract. More specifically, the only way to find that defendant initiated the proposal is to treat the inquiry defendant made in its phone call in late 1962 as the initiation of the proposal. However, subsection (b) of the Value Engineering Incentive clause makes it clear that that clause relates only to proposals initiated and developed "during the life of this contract." This contract, which was signed and awarded by defendant on March 18, 1963, had an effective date of January 18, 1963. The first definitive action by either party "during the life of this contract" was plaintiff's submission to defendant on March 20, 1963, of the drawing incorporating proposed var-

iations. Therefore, plaintiff initiated the proposed variations within the terms of the clause. It is granted that this is not the only possible interpretation of the provision. Nevertheless, it is well settled that where a provision in a contract is susceptible of more than one reasonable interpretation, any ambiguity must be resolved against the party who drafted the contract. Bennett v. United States, 371 F.2d 859, 178 Ct.Cl. 61 (1967). Since this clause was drafted by the Government, it should be read against the defendant.

■ There is a more fundamental reason, however, for considering the Value Engineering Incentive clause applicable. A close reading of subsection (a) of that clause shows that it does not apply to proposals or suggestions in general, but to proposals *"for variation from contractual requirements."* [Emphasis supplied.] Plaintiff is the one who put together and assembled a concrete proposal for a change in the contractual requirements. Plaintiff studied the feasibility of a change, developed a prototype, and prepared a drawing detailing the exact proposal, attaching a letter requesting review by defendant so that plaintiff could make the change in all subsequent assemblies. Such action by plaintiff clearly constituted the initiation and development of a "proposal * * * for variation from contractual requirements" and entitled plaintiff to share in the cost savings therein.

Hill Air Force Base, on the other hand, did not initiate any proposal for a change. The officer at Hill merely asked plaintiff to study the possibility of a modification. A vague suggestion or inquiry as to a possibility is far different from a concrete formulated proposal for a change, such as plaintiff submitted.

■■ The Board's interpretation of the word "initiated" in this case would act to destroy the very purpose of the Value Engineering Incentive clause. That purpose is to encourage the con-

tractor to develop and submit to the Government cost-reduction proposals requiring a change in the contract requirements.[2] Under the former practice, any cost-reduction proposals would result in the Government reducing the contract price by issuing a change order under the "Changes" clause. This tended to discourage contractors from submitting cost-reduction proposals. If "initiated" in the Value Engineering Incentive clause were interpreted to include a mere inquiry by the Government as to whether some improvement were possible or could be developed, the situation would revert back to its original status. The Value Engineering Incentive clause would not be applicable to any cost reductions developed from that inquiry, because the Government would be deemed to have "initiated" the proposal. Then, the path would be open to the Government to claim all the savings for itself by issuing a change order. Once this procedure became established, the contractor's incentive to develop and submit cost-reduction proposals would disappear. Consequently, the Government should not be able to deprive the contractor of the benefits of the Value Engineering Incentive clause simply and solely by asking whether some suggested improvement could be developed.

Thus, both the language and the policy of the Value Engineering Incentive clause lead us to conclude that the plaintiff in this case did initiate and develop a proposal for variation from contractual requirements, under the Value Engineering Incentive clause.

There is the further problem that plaintiff failed to comply with some of the technical requirements of that clause, governing the form in which the

proposal was submitted. Subsection (a) of the clause stipulates that:

* * * Such proposals will be submitted to the Government in the same form as prescribed for any other proposal which would likewise necessitate a change in contractual requirements, but will include a statement that they are subject to the operation of this clause. * * *

▬▬▬ Plaintiff's failure to meet these requirements presents no obstacle to its recovery here, however. Since this clause had been inserted in the contract by the Government for the benefit of the contractor, the Government is free to waive its technical requirements when the Government desires that the contractor reap the benefits of the clause. Defendant's letters of January 8 and May 22, 1964, constitute such a waiver. In both letters the defendant indicated it considered plaintiff's proposal to be under the Value Engineering Incentive clause, even though plaintiff had failed to submit the proposal in the proper form.

▬▬▬ Finally, the actual belated issuance of a change order in this case has no effect on the conclusion reached above. The Value Engineering Incentive clause, when it is applicable, obviously takes precedence over the Changes clause. In other words, if the Government accepts and incorporates the contractor's proposal into the contract, the contractor becomes entitled to one-half of the savings, and the Government cannot deprive the contractor of that benefit by issuance of a change order to any other effect.

For the reasons stated above, plaintiff is entitled to recover, under the Value Engineering Incentive clause, the sum of

2. The policy behind the Value Engineering Incentive clause is described at 32 C.F.R. §§ 1.1701 (Policy) and 1.1702–1 (Value Engineering Incentives—Description) (1967). Section 1.1702–1 reads, in part, as follows:

"* * * Therefore, the objective of a value engineering incentive provision is

to encourage the contractor to develop and submit to the Government cost reduction proposals which involve changes in the contract specifications * * *. * * * *"

Interestingly enough, the word "initiated" is not used anywhere in the above sections.

$7,295.26, one-half of the $14,590.51 cost savings or reduction in the contract price assessed by defendant against plaintiff.

Plaintiff's motion for summary judgment is granted to the extent of one-half of the savings in costs under the Value Engineering Incentive clause; defendant's cross-motion for summary judgment is denied. Judgment is entered for plaintiff in the amount of seven thousand two hundred ninety-five dollars and twenty-six cents ($7,295.26).