**GRISMAC CORPORATION**

v.

**The UNITED STATES.**

**No. 4–72.**

United States Court of Claims.

May 18, 1977.

---

John J. Reed, Washington, D. C., attorney of record for plaintiff. Hudson, Creyke, Koehler & Tacke, Washington, D. C., of counsel.

Frances L. Nunn, Washington, D. C., with whom was Acting Asst. Atty. Gen., Barbara Allen Babcock, Washington, D. C., for defendant.

Before NICHOLS, KUNZIG and BENNETT, Judges.

## OPINION

NICHOLS, Judge.

This case is before the court on defendant's exceptions to fact findings, conclusion of law, and proposed opinion filed by Trial Judge C. Murray Bernhardt in accordance with Rule 134(h). The facts found by the court are those stated in this opinion. It is unnecessary to pass on both parties' exceptions to the trial judge's fact findings, as they would not change the result if sustained. We differ with the trial judge's legal conclusions, though we are greatly aided by his able analysis of the novel and interesting problem presented. We conclude that the action cannot be maintained and the petition must be dismissed.

The suit is under the Tucker Act, 28 U.S.C. § 1491, to enforce an alleged contract or contracts "implied in fact." The parties have not discussed, nor do we consider, whether the action is maintainable in face of 31 U.S.C. § 200. Our conclusion is reached on other grounds.

Our legal conclusion considerably diminishes the amount of detail as to the facts that need be stated.

In the spring of 1969 plaintiff submitted proposals 63314 and 63316 to the Army Ammunition Procurement and Supply Agency at Joliet, Illinois ("APSA"), and proposal 63313 to the Savanna Army Depot in Savanna, Illinois. Proposal 63313 was handled by APSA along with the other two. Each proposal was headed "Unsolicited Value Engineering Proposal." No. 63313, dated March 20, 1969, recommended that the decks for wooden pallets used as a base for storing and handling boxed ammunition employ a cheaper CD grade of plywood instead of the prevailing CC grade. No. 63314, dated March 21, 1969, recommended the same plywood substitution for wirebound ammunition crates. No. 63316, dated June 18, 1969, recommended reduction of the standard deck size of the pallet from $27\frac{3}{4}'' \times 34\frac{3}{4}''$ to a deck of smaller dimensions, so that five rather than three decks could be obtained from a standard size $48'' \times 96''$ plywood sheet and at the same time accommodate the varying stacked dimensions of ammunition boxes loaded thereon, with an obvious saving from waste reduction.

Each of the three proposals bore the following restrictive legend:

*Notice:* The data contained herein shall not be disclosed outside the government, or duplicated, used, or disclosed in whole or in part, for any purpose other than to evaluate this value engineering proposal; except that if this proposal be accepted by the government, the government shall have the rights to the use of the data, and may duplicate or disclose, in whole or in part, in any manner and for any purpose whatsoever, and shall have or permit others to do so, to the extent necessary to fully utilize the proposal.

Each proposal also expressed the plaintiff's desire to negotiate compensation in the form of a share in the Government's present and future contract savings attributable to use of the proposal.

Because of the "value engineering" title on each of plaintiff's proposals, all three

when received by APSA's Value Engineering Office ("VEO") were forwarded to appropriate Army offices charged with the evaluation of value engineering change proposals ("VECP"). VECP's were (and are) cost reduction proposals offered to the Government *under existing express contracts* pursuant to Armed Services Procurement Regulation ("ASPR") 1–1701 *et seq.*, 32 C.F.R. §§ 1.1701 *et seq.* (1969). If a proposal was deemed meritorious, *i.e.*, technically adequate, beyond existing contract requirements, and cost-saving, the cognizant office was to incorporate it into current procurement specifications for that item. Since a compensable VECP could be submitted by a contractor only under an existing contract containing a "value engineering incentive clause," he would be compensated if at all by an adjustment under his existing contract. No separate contract to compensate for use of the idea was needed.

The problem here is that despite the fact that plaintiff had no express contract with the Army containing a value engineering incentive clause as a basis for its proposals, the proposals themselves were nevertheless incorporated into Army procurement specifications as if they were VECP's, and were thereafter used throughout the Army. At the outset APSA's VEO noted that the proposals were "unsolicited," *i. e.*, without an existing contract as a predicate, but raised no questions and did not alter its procedures on that account. The thought of procedural deficiencies did not occur to VEO until after the Army had adopted and used the suggestions. Instead, as stated, VEO routed the proposals upon receipt to the cognizant offices for processing. No. 63314 went to Picatinny Arsenal at Dover, New Jersey ("Picatinny"), and Nos. 63313 and 63316 went to APSA's Technical Data Division ("TDD"). After processing clearance through a chain of technically cognizant offices the proposals were changed in minor respects, adopted, and thereupon distributed to all Government-owned, contractor operated ("Go-co") load plants as official changes (mostly mandatory) in the applicable technical instructions and/or engineer-

ing orders, so that thereafter all such pallets had to conform to the changes suggested by plaintiff (changes in material for wirebound boxes were optional), with minor amendments.

In point of fact the ideas were not entirely new. Some Army installations had arrived at similar ones, unknown to plaintiff and the officials with which it dealt, and had put them into effect. Details as to this are not necessary as it is not the ground of our decision, though defendant has argued lack of novelty at length and denies that plaintiff actually brought about the changes in practice above-mentioned. We do not pass on this.

Having, as it supposed, put plaintiff's ideas to extensive use, VEO belatedly turned its attention to the question of compensation. Plaintiff obviously never expected to make its contribution for nothing, and the effective immediate seizure and use of it with the failure to compensate or even discover a basis of compensation, caused and still causes the Army to cut a *bruta figura*, as an Italian would say. Initially, the problem was a dispute among Army lawyers as to whether 10 U.S.C. § 2386 (further discussed below) and implementing regulations (as to which also see below) permitted the expenditure of procurement funds to pay plaintiff for its ideas. Then surfaced the issue of originality, and other matter throwing doubt on the value of the ideas. Plaintiff wanted $1,500,000, and is demanding $3,519,761 here, with a percentage of future savings. Ultimately APSA decided to work up a proposal to pay $50,-000 under the present statutory successor to the First War Powers Act, now 50 U.S.C. §§ 1431–1435, as the effectuation of an informal commitment. Implementing regulations under this authority, as they were then, are in ASPR § 17–000 and *ff.*, 32 C.F.R. § 17.000 and *ff.* (This and subsequent ASPR references are to the January 1, 1971 revision.) There were stringent limitations that circumscribed any action of this kind; the APSA officials could not have done it on their own; and there is nothing to show that the right to make a

legal payment could have been established. The proposal was dropped because plaintiff rejected the $50,000 as wholly inadequate.

The findings and the trial judge's proposed opinion deal extensively with the question of identifying who in the Armed Forces might have had authority to bind the Government to a contract implied in fact of the kind described, and when such a person was found, whether acquiescence in the procurement could be imputed to him. We think all this is interesting but here preempted by the question whether anyone except Congress had such authority. Congress could have created a money liability in a case of this kind, but the question to be faced is whether it ever did. *Eastport S.S. Corp. v. United States,* 372 F.2d 1002, 178 Ct.Cl. 599 (1967). In that case, too, defendant cut a *bruta figura,* for by bureaucratic bungling it had caused plaintiff substantial loss, but this was not enough for liability in this court.

*Padbloc Co. v. United States,* 161 Ct.Cl. 369 (1963), quite closely resembles in its facts the case at bar. In indicates that the Government can be liable to pay compensation on an implied contract theory if it misappropriates and uses intellectual property not amounting to a patent or copyright, and submitted under restrictive clauses for the purpose of making a sale. In that case, however, the property was a design. The findings include several pages of drawings. By virtue of 10 U.S.C. § 2386, funds appropriated for procurement could have been used to purchase a "design," by the statute's express terms. Thus the implied contract was one which could have been made express, and the *Eastport* standard was met. This is not spelled out in the opinion, presumably because not debated by counsel. But the case is clearly not authority that the Government may be mulcted under an implied contract in a situation where it could not have made an express one that would be binding.

■ We agree with the Army lawyers that the decisive issue in this case is whether 10 U.S.C. § 2386 authorizes expenditure of appropriated funds to purchase sugges-

tions of the kind plaintiff submitted. That section reads as follows:

Funds appropriated for a military department available for making or procuring supplies may be used to acquire any of the following if the acquisition relates to supplies or processes produced or used by or for, or useful to, that department:

(1) Copyrights, patents, and applications for patents.

(2) Licenses under copyrights, patents, and applications for patents.

(3) Designs, processes, and manufacturing data.

(4) Releases, before suit is brought, for past infringement of patents or copyrights.

We do not think plaintiff's ideas naturally fit any of these statutory categories. The *mot juste* for them appears to us to be "suggestions." Congress did not authorize expenditures under § 2386 for mere suggestions. That it knew how to do so when it wished is evident from 5 U.S.C. § 4503, which authorizes payment of cash awards for the honorary recognition of an employee [of the Government] who

(1) by his *suggestion* [emphasis supplied] invention, superior accomplishment, or other personal effort contributes to the efficiency, economy or other improvement of Government operations; * *.

This of course was given the widest possible scope, pursuant to the Congressional desire to provide incentives to leaven the lump of the Civil Service, where too often superior performance and mediocrity fare exactly the same with respect to promotion and rewards. The nature of the "suggestion" that might qualify for an award appears in *Shaller v. United States,* 202 Ct.Cl. 571, cert. denied, 414 U.S. 1092, 94 S.Ct. 723, 38 L.Ed.2d 549 (1973). There is no evidence of any such liberality respecting outside parties submitting suggestions called unsolicited value engineering proposals.

The distinction between mere suggestions and secrets, designs, processes, or data protected as intellectual property, is recognized

in law respecting dealings of private parties. Thus in *Federal Welding Service, Inc. v. Dioguardi,* 184 F.Supp. 333 (E.D.N.Y. 1960), the court held that the concept of limiting the height of metal caskets to 24 inches, so that three could be stacked one on top of another, in one grave, was not protected intellectual property. There must be entrusted "by the complaining party to another, of a tangible thing in condition for reproduction, not the mere concept of a desirable result" p. 338. It is not, however, intended to suggest that Congress incorporated in § 2386 any state common law respecting intellectual property. It must be read in light of its own language, its context in the U. S. Code and the administrative interpretation it has been given.

■ The trial judge does not advert in his opinion to § 2386 (though it is mentioned in the findings). He deduces authority to contract, which implicitly he agrees is necessary if plaintiff is to recover, from a melange of ASPR provisions. Should statutory authority be lacking, ASPR could hardly supply it, but no doubt a long established ASPR provision, interpreting a statute, would aid us in construing that statute, should we find ambiguity. Here, however, there is no relevant ASPR provision not well sustained by the statutes behind it.

Since plaintiff and APSA both started their dealings with the idea that the Value Engineering provisions of ASPR § 1–1701 and *ff.,* would govern, we start there too. These are a lengthy set of standard contract clauses, and rules, to give Defense contractors incentives to device and propose economies in the performance of their contracts, whose benefits they and the Government would share. See *Airmotive Eng. Corp. v. United States,* 535 F.2d 8, 210 Ct.Cl. 7 (1976); *Dravo Corp. v. United States,* 480 F.2d 1331, 202 Ct.Cl. 500 (1973); *B. F. Goodrich Co. v. United States,* 398 F.2d 843, 185 Ct.Cl. 14 (1968). Only one clause fits plaintiff's situation as one who then had no contractual relations with the Government. This is § 1–1701(c), which provides that "unsolicited" proposals may come from contractors who "no longer"

have a production "or other" contract. Such proposals, it recites, would not be within the subpart, but it is desirable that potential cost reduction resulting from "unsolicited proposals" be realized. "Accordingly, nothing in this subpart shall be construed to preclude the purchase of unsolicited proposals on a case-by-case basis or other special contractual arrangements pursuant to Subpart B, Part 9 of this Chapter, or 10 U.S.C. § 2386, which are necessary to induce contractors to develop such proposals and make them available to the Government."

It is clear that this clause guided plaintiff in preparing and presenting its proposals, which it called "Unsolicited Value Engineering Proposal[s]." It may have overlooked that the clause's function was chiefly or wholly that of a cross-reference, guarding against the danger, always present in Government operations, that one hand will not know what the other is doing. It does indicate that the writer of this part of ASPR knew of no other ASPR provision that might provide authority to deal with unsolicited value engineering proposals. Why APSA did not at once transfer the proposals to the indicated frame of reference is one of the mysteries of this case. Plaintiff argues that mere suggestions by a contractor are compensable as value engineering, but the above language is not sufficient to make the same thing likewise true of an unsolicited suggestion.

On turning to Subpart B, Part 9, § 9–200 and *ff.,* one finds that it deals with acquisition of rights in technical and other data and copyrights. In § 9–201(a) "data" is defined to mean "writings, sound recordings, pictorial reproductions, drawings, or other graphic representations, and works of a similar nature, whether or not copyrighted." It does not appear that plaintiff's proposals were "data" within this language, though literally "writings." Despite the seeming intimation in the above cross-reference to the contrary, there is no language in Subpart B, Part 9 to constitute procurement authority in and of itself, independent of what might be found elsewhere in respect to, *e. g.,* Research and Development

contracts. Subpart B, Part 9 does not assert a procurement authority to purchase suggestions not within the scope of 10 U.S.C. § 2386.

Though not included in the above-mentioned cross-reference in ASPR § 1–1701(c), consideration should also be given to ASPR § 4–106, entitled *Selection of research and development contractors.* Section 4–106–1(e) deals with *Unsolicited proposals.* The language and context, however, indicate that the proposals dealt with are proposals to enter into R & D contracts.

Finally, ASPR § 17–204–4 provides authority for formalizing informal commitments under certain circumstances. Generally it will permit payments to persons who have taken action without a formal contract, for example, where a person has furnished property or services pursuant to written or oral instructions from a military officer and relying in good faith upon his apparent authority. As indicated above, the statute behind this is 50 U.S.C. §§ 1431–1435. This was the authority under which the proposed $50,000 payment would have been made, but it is not contended that this discretionary authority adds anything to the legal remedies, if any, available in this court. The very existence of it, however, negatives or tends to negative the supposition of a broad procurement authority not founded on statute, which will supply an implied contract liability where an express contract could not be made.

We do not find any other ASPR provisions that have a bearing and must reject the attempt to use a collage of citations out of context from here and there in those vast volumes to prove inferentially the existence of a procurement authority that is not expressly granted in statute, nor asserted in the procurement regulations, ASPR, to exist.

The dispute among the Army lawyers mentioned above, is reflected in part in plaintiff's exhibits 21, 22 and 27, in this case. Both sides recognized that the issues were unprecedented. It appears that the Army Materiel Command General Counsel, Kendall Barnes, took essentially the position taken here, i. e., that the plaintiff's proposals were mere suggestions not covered by § 2386. He seems to have stated the view that § 2386 applies only to legally protected intellectual property. This may be too restrictive a reading, but rejection of it does not necessarily extend the section to mere suggestions. The JAG took the contrary view. He relied as legislative history on a recital of similar provisions antedating the enactment of the present § 2386 into permanent law in 1953, but failed to show that any predecessor law was ever actually used as authority to pay for suggestions or ever was so construed. Legislative history of § 2386 itself is apparently hard to come by. The remainder of his argument seems to consist of references to general statutes not on their face purporting to grant procurement authority, and to the ASPR provisions already mentioned. The JAG used the bootstrap argument already mentioned, that the terms of reference to Subpart B, Part 9 in ASPR § 1–1701(c) somehow elevates the former into procurement authority. Nothing in our decision, however, is to be read as stating the JAG was wrong in holding that the Army could pay Grismac an agreed settlement without illegality.

Our position is based on and applies only to the remedies available in this court. We say nothing as to the legality of any payments that procurement officials might voluntarily make to settle claims of persons other than employees who have made useful suggestions. The difficulties encountered there may have been imaginary, as the JAG thought, or may have been real. We do not pass on that.

█ In view of the foregoing, we conclude that defendant's officials, high or low, in the Department of Defense, did not have authority to make express contracts obligating appropriated funds for the purchase of suggestions, that in the absence of such authority, it was not legally possible for them to make implied contracts enforceable here, to the same end, and that the suit here having no other foundation, it cannot be maintained.

Accordingly, the petition is dismissed.