**CITY OF ALEXANDRIA, Appellee,**

**v.**

**The UNITED STATES, Appellant.**

**Appeal No. 84–713.**

United States Court of Appeals,
Federal Circuit.

June 21, 1984.

Judith E. Schaeffer, Washington, D.C., argued for appellee. With her on the brief were Kenneth L. Adams, Washington, D.C., and Cyril D. Calley, Alexandria, Va., of counsel.

Donald T. Hornstein, Washington, D.C., argued for appellant. With him on the brief were F. Henry Habicht, II, Asst. Atty. Gen., and Dirk D. Snel, Washington, D.C. Also on the brief was Terry Hart Lee, Washington, D.C., of counsel.

Steven R. Ross and Michael L. Murray, Washington, D.C. were on the brief for amici curiae.

Before KASHIWA, Circuit Judge, NICHOLS, Senior Circuit Judge, and SMITH, Circuit Judge.

NICHOLS, Senior Circuit Judge.

In this appeal from a decision of the United States Claims Court [*] on a Tucker Act claim, 28 U.S.C. § 1491, the issues are whether the United States entered into an implied contract to sell land, or became estopped to deny the existence of an express one. In holding for the City of Alexandria (City), the judge relied on her view that 40 U.S.C. § 484(e)(3) is unconstitutional on its face or as applied in this case. The challenged statute authorizes disposal of surplus government land by negotiation if the grantee is a state or its political subdivision and if the estimated fair market value is obtained, and it also requires, in subsection (6) that an explanation of the circumstances of such disposal by negotiation shall be prepared and transmitted to the appropriate committees of the Congress in advance of such disposal. We read her as conceding that if the statute is not void, the government has a good defense. Other prerequisites to government liability having in her view been met, she eliminated the above notice provision because of its invalidity. We differ with this reasoning and therefore *reverse*.

[*] 3 Cl.Ct. 667 (1983).

*Facts*

The case was decided on summary judgment. The court had before it a government motion for summary judgment on the existence of an express contract which was granted but held moot. Plaintiff's motion for summary judgment on estoppel was denied and defendant's granted, but declared moot. Plaintiff also made an oral motion for summary judgment based on a contract implied in fact and this was granted and the clerk was directed to enter judgment for plaintiff in the amount of $575,000. This was on October 20, 1983. Earlier that year, the Supreme Court's one-house veto decision, *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (familiarity with which is assumed), had come down. Upon perusing the opinion in that case, the Claims Court judge formed the view that *Chadha* might require a holding for the City on a different ground than any of those urged in the written motions. Four days before the date set for hearing on the written motions, she notified counsel to be prepared to discuss the *Chadha* issue also. The parties had fully documented the facts relating to their motions pending but had no opportunity to submit any further documentation for or against the oral motion. This could be important if the actual relations of the committees and the General Services Administration (GSA) might have a bearing on whether the statute is unconstitutional as applied. Among the questions we must determine, therefore, is whether a remand for further fact finding should be part of our decision.

The facts of the negotiation in question are set forth in great detail in the trial court opinion. For understanding of our present opinion it suffices to say that the surplus real property involved had been the site of a government warehouse in Old Town Alexandria, Virginia. At times relevant to the litigation, it was in use as a parking lot. Title 40 U.S.C. § 484(a) empowers the Administrator of the GSA to

supervise and direct sales of real property when surplus. His power is redelegated to regional administrators. The City, on November 17, 1978, notified GSA it wished to acquire the lot by negotiation under the statute already mentioned. On May 16, 1979, the regional office was authorized to negotiate a sale at a price not under the appraised value of $790,000. Regional Administrator Kallaur asked the City to submit an offer, but warned about the necessity of submitting a statement to Congress and stated the offer probably would not be accepted by the government until after the proposed disposal has been considered by such committee. The notice stated that the City had already offered $925,000, which exceeded the appraisal value, but by the GSA Handbook the appraisal had to be updated if over 9 months old at the date of submissal of the explanatory statement. At the end of a meeting August 6, Mr. Kallaur stated they had a deal and confirmed it by letter August 7, in which he said he would proceed with the sale if the City so wished. The City Council passed an enabling resolution September 11. On October 9 the City submitted a formal "offer" with an earnest money deposit of $92,-500 and Mr. Brooks, another GSA official, assured the City that it had done everything required of it and the property would be conveyed to the City for $925,000.

By some unaccountable error nothing was done until November 1980 to submit the sale to Congress. City officials were, however, reassured that the sale was "being processed," which was not true. On November 19, 1980, a new appraisal showed a value of $1,375,000 and the City was invited to submit an offer at that price. On the City's protest, Mr. Kallaur decided there had been "an administrative error, a grotesque error," and GSA was obligated to sell at the original agreed price. However, he lacked authority to do this himself and asked for the administrator's approval which was never forthcoming. He would have had to violate GSA regulations by supporting the sale with an outdated appraisal but was prepared to do so if Congress approved. Mr. Kline, the Acting Administrator, talked informally to the Chairman of the House Committee and one of his staff, but refused to go through with a formal submission which, he thought, would "be shot down."

It seems clear enough from the judge's recitals that neither the acting administrator nor the committee chairman were willing to take sole responsibility for selling on an outdated appraisal.

Meanwhile, the next appraisal went up to $1,500,000 and the City purchased the lot at that price, under protest and reserving its rights.

There was considerable evidence, believed by the trial judge, that the GSA never consummated a sale that the committee disapproved nor did its own regulations contemplate that this was possible, she says. 41 C.F.R. § 101–47.304–12 (1982). This regulation says that on committee approval the sale will proceed. It does not reveal what happens if a committee disapproves. The defendant calls attention, however, to an official report of 1976 revealing that one such sale was consummated.

### Applicable Statute

Pertinent parts of the statute held unconstitutional (40 U.S.C. § 484), are as follows:

§ 484. Disposal of surplus property

(a) Supervision and direction

Except as otherwise provided in this section, the Administrator shall have supervision and direction over the disposition of surplus property. Such property shall be disposed of to such extent, at such time, in such areas, by such agencies, at such terms and conditions, and in such manner, as may be prescribed in or pursuant to this Act.

\* \* \* \* \* \*

(e) Bids for disposal; advertising; procedure; disposal by negotiation; explanatory statement

(1) All disposals or contracts for disposal of surplus property \* \* \* shall be made after publicly advertising for bids

* * * except as provided in paragraphs (3) * * * of this subsection.

\* \* \* \* \* \*·

(3) Disposals and contracts for disposal may be negotiated, * * * if—

\* \* \* \* \* \*

(H) the disposal will be to States, Territories, possessions, political subdivisions thereof, or tax-supported agencies therein, and the estimated fair market value of the property and other satisfactory terms of disposal are obtained by negotiation; * * *

\* \* \* \* \* \*

(6) Except as otherwise provided by this paragraph, an explanatory statement of the circumstances of each disposal by negotiation of any real or personal property having a fair market value in excess of $1,000 shall be prepared. Each such statement shall be transmitted to the appropriate committees of the Congress in advance of such disposal, and a copy thereof shall be preserved in the files of the executive agency making such disposal. * * *

### Discussion

### A

### No Express Contract

The judge holds that under the facts recited, no express contract of sale came into being, citing *Kellerblock v. United States*, 219 Ct.Cl. 608, 618 F.2d 119 (1979), *Russell Corp. v. United States*, 210 Ct.Cl. 596, 537 F.2d 474 (Ct.Cl.1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977). We need not explore this conclusion since the City does not challenge it in this appeal.

### B

### No Implied Contract

1. *The statute is valid.*

■ We turn to constitutionality of the statute, the issue which is decisive. That the statute, 40 U.S.C. § 484(e)(6), is unconstitutional, on its face, is an untenable proposition which the judge probably did not wish to be understood as uttering, and which at any rate is abandoned in the appellee's brief in this appeal. The *Chadha* case, *supra*, strikes down the currently familiar legislative device of the one-house veto. After its surgery under the Supreme Court knife, the Immigration Act still includes a "report and wait" provision indistinguishable on principle from the one at bar in this court. This provision is held, under the portion of Chief Justice Burger's opinion entitled "Severability," to remain in effect. *See also* 462 U.S. ——, 103 S.Ct. at 2776, n. 9; 77 L.Ed.2d 317; 103 S.Ct. at 2786 n. 19. Clearly in the Supreme Court's eyes, "report and wait" is a legitimate and constitutional means by which Congress can check and review executive action.

The *Court of Claims* considered such a "report and wait" provision, relating to proposed military land purchases, in *Armijo v. United States*, 229 Ct.Cl. 34, 663 F.2d 90 (1981). It was noted that the provision superseded an earlier one requiring express "agreement" by the concerned committees, and the amendment was to meet executive branch objections. Counsel advise that the executive branch has never objected to "report and wait" provisions, as it so often had done as to the "one-house veto."

While the Claims Court's suppositions about actual executive branch and congressional practice under this "report and wait" provision may well be insufficiently documented, and at least to require a remand for further development of the record, we elect not to go off on that ground. It seems apparent that there would not be an unconstitutional "one-house veto" even if the judge's suppositions about the facts were entirely correct. In these circumstances, a remand for further development of the facts would be a waste of judicial resources.

We take notice that since early in the 19th Century there have been marked differences between the United States Congress and other parliamentary bodies. One is the greater development of the commit-

tee system here, as the statute illustrates. Committee chairmen and members naturally develop interest and expertise in the subjects entrusted to their continuing surveillance. Officials in the executive branch have to take these committees into account and keep them informed, respond to their inquiries, and it may be, flatter and please them when necessary. Committees do not need even the type of "report and wait" provision we have here to develop enormous influence over executive branch doings. There is nothing unconstitutional about this: indeed, our separation of powers makes such informal cooperation much more necessary than it would be in a pure system of parliamentary government. As Justice Jackson stated in his concurring opinion in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952), and which Justice Powell quotes in part in his *Chadha* concurring opinion:

> The actual art of governing under our Constitution does not and cannot conform to judicial definitions of the power of any of its branches based on isolated clauses or even single Articles torn from context. While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity. [462 U.S. 919, ——, 103 S.Ct. 2764, 2789, 77 L.Ed.2d 317 (1983) ]

In the spirit of this utterance, it might well appear the height of folly for the GSA Administrator to engage in a land transaction without informing the Congress, where it had indicated its special interest. It would be hardly less folly to rush through a proposed transaction in disregard of congressional opposition. Presidents may at times be at loggerheads with Congress in highly publicized matters, of national significance usually. They do not employ GSA Administrators to place themselves at loggerheads likewise, in smaller matters. Concession is necessary at times to make separation of powers work. It

would not necessarily reveal an indefensible abnegation if he were *never* to go through a land transaction disapproved by one of these committees, with the sole exception one where a matter of principle was involved, which will be rare. Then, too, if the objections of the committee were mistaken it would be his duty to explain the case and try to convince. Whatever his choices, they do not imply a usurpation by Congress, such as *Chadha* holds the one-house veto provision to be. If, in the end, the GSA and the committee are at loggerheads about some transaction, the committee having voted disapproval but the administrator insisting on going ahead, Congress has plenty of perfectly constitutional ways to work its will, and "report and wait" provisions, however implemented in practice, do not suggest or imply needless resort to some unconstitutional means. Suspension of deportation by the Immigration and Naturalization Service after disapproval by "one-house veto" would be illegal, but nothing suggests that here a committee vote of disapproval in any way changes the law. It is not a question of a statute being unconstitutional as applied, but a question of information constitutionally transmitted being possibly used in an unconstitutional way at a later date, instead of constitutionally as it should and could be.

According to the facts believed by the Claims Court judge, the administrator communicated informally with a committee chairman and learned that there would be so much opposition it would be unwise to make a formal report. This is not at all the same thing as conferring an outright veto power on a committee, because the administrator may have thought it prudent to yield in this and other such cases because he perceived that opposition on the committee's part could make itself felt in action by the full Congress in a constitutional way. If he couldn't persuade the committee, chances of persuading the full Congress were too slim to be worth the pursuit.

The Claims Court judge writes "[w]hat is reserved is the power to disapprove or to

withhold approval without passing legislation." This is true: the committees can disapprove. The right question is not asked: What is the legal effect of disapproval? That it has great moral effect cannot be doubted: does the committee demand more? Thus there is nothing to show that the "report and wait" provision of this statute is unconstitutional as applied.

The parties have a great deal to say in their briefs about abnegation of discretion. The City cites and relies on *Schlesinger v. United States,* 182 Ct.Cl. 571, 390 F.2d 702 (1968). In that case the Navy terminated for default a contract to supply enlisted men's caps, because of pressure by a congressional committee which had formed an unfavorable impression of Mr. Schlesinger's integrity. The court held that though there was a technical default, the Navy had discretion to waive it and had some grounds for doing so. The discretion was never exercised because the congressional pressure was believed so great. The contract was held to entitle Mr. Schlesinger to an exercise of reasoned and informed discretion by the Navy. As a contract right, it is enforceable under the Tucker Act. Not having exercised discretion was a breach on the Navy's part, but another contract clause provided for settlement in such a case under the Termination Article, so Mr. Schlesinger did not get damages based on anticipated profits. The opinion clearly states that the entitlement to an exercise of discretion derives from the contract itself.

2. *No implied in fact contract in view of the statute.*

■■■ If the "report and wait" statute is not out of the case because it is void, it stands as a barrier to recovery on a theory of a contract implied in fact, as the judge impliedly concedes. Under the express contract theory, the absence of a signature to the contract by the United States official authorized to sign, was fatal. This might not be so under an implied contract theory. However, in respect to an implied contract, the officials of the United States whose

acts might bind it, must have authority to do so, just as the case is with an express contract. *Grismac Corp. v. United States,* 214 Ct.Cl. 39, 556 F.2d 494 (1977). Such authority did not exist because the "report and wait" statutory provision had not been complied with. The City was expressly on notice that there would have to be compliance before a contract could be made. *Empresas Electronicas Walser, Inc. v. United States,* 223 Ct.Cl. 686, 650 F.2d 286 (1980); *Tree Farm Development Corp. v. United States,* 218 Ct.Cl. 308, 585 F.2d 493 (1978).

The implied contract theory might be argued to be that of the "disappointed bidders" case, *e.g., Keco Industries, Inc. v. United States,* 192 Ct.Cl. 773, 428 F.2d 1233 (1970), *i.e.,* a contract is implied to consider a bidder's proposals fairly. However, the money remedy in those cases is bid preparation costs only, and a claim, as here, for the full value of the lost bargain, is not supported by those cases.

3. *No Estoppel.*

■■■ The asserted estoppel is based on statements by GSA's Mr. Kallaur that if the City submitted the necessary documents he would proceed with the sale (August 7, 1979), statements by various other GSA officials that the $925,000 sale was being processed (October 1979 to November 1980) and, as to the second or $1,375,000 appraisal, that the City was told not to proceed with a purchase at this price because the $925,000 offer was still viable. The City cites *Emeco Industries, Inc. v. United States,* 202 Ct.Cl. 1006, 485 F.2d 652 (Ct.Cl.1973) and *Manloading and Management Associates, Inc. v. United States,* 198 Ct.Cl. 628, 461 F.2d 1299 (1972).

Neither of these cases involved, and the City does not discuss, the difficulty inherent in estopping the United States into a contract no official is authorized to make expressly. In *Manloading and Management, supra* at 1302–03, the court noted that the misrepresentations did not have the effect of nullifying a statutory requirement. The Court of Claims discussed this issue in *Broad Avenue Laundry and Tai-*

*loring v. United States*, 681 F.2d 746 (Ct. Cl.1982). It held that the government might be estopped by formal rulings of a contracting officer, though based on a mistake of law, if within the officer's subject matter jurisdiction and not "contrary to any express authority limitation." Mere oral expressions of opinion were also excepted.

The Court of Claims discussed the then recent case of *Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981), which reveals a marked reluctance to allow the government to be estopped by erroneous statements of government officials when the asserted estoppel would nullify a prerequisite prescribed by Congress for valid action. That case involved an entitlement, but we did not then, nor do we now, regard that fact as stripping it of precedential value in contract cases.

The recent Supreme Court decision in *Heckler v. Community Health Service of Crawford County, Inc.*, ‒‒ U.S. ‒‒, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984) throws added light on the possibility of estopping the government. It seems to lay down a rule that an estopping statement must be in writing and by a speaker at a policymaking level. The rule as to writing may not be *per se*, but if not, it states at least a test to be applied. Alexandria's claim does not fare well by this analysis as the alleged statements relied on were oral and by officials not at the policymaking level, that is, they were not at the level that could commit the agency to effect the sale. Moreover, the alleged estopping statements fall short of saying that the City has its contract. "Processing" implies things to do which might still thwart effectuation of the deal. To be sure, the GSA officials had "authority" to make the statements they did, in that they were within the official's subject matter jurisdiction. They did not have "authority" to nullify a congressional enactment.

The Claims Court is, of course, subject to the peculiar limitations of the Tucker Act, 28 U.S.C. § 1491, *as amended.* What some

other court might do is not before us for adjudication.

### C
### *The Claim is Noncontractual*

For the reasons stated above, the City never had a contract, express or implied, nor is the United States estopped from relying as a defense on the nonexistence of such a contract. In *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. 599, 372 F.2d 1002 (1967), the Court of Claims made the point that, for purposes of Tucker Act jurisdiction, a noncontractual claim can be of one or the other of two kinds. The first is for money illegally exacted, as for example, tax refund claims. The other is when the claimant shows that some specific provision of law commands expressly or by implication the payment of money upon proof of conditions he is said to meet, *e.g.*, fifth amendment taking claims or claims by illegally discharged government employees for back pay. The claim in *Eastport Steamship* was neither of these. It was to recover for loss of a favorable bargain caused by excessive delay of the Maritime Commission in licensing sale of a United States flag steamer to a foreign buyer. With all contract theories eliminated, the parallel between that case and the one before us is complete. Here too, the City lost, because of excessive and inexcusable delay, a chance to purchase at a price more favorable to it than prices later available.

In *City of Manassas Park v. United States*, 224 Ct.Cl. 515, 633 F.2d 181, *cert. denied*, 449 U.S. 1035, 101 S.Ct. 611, 66 L.Ed.2d 497 (1980), the Court of Claims, commenting on *Eastport*, said at 183:

> Thus not every instance of misgovernment by a United States agency that is costly to private parties, or local and state interests, generates a valid Tucker Act claim.

The Tucker Act waives sovereign immunity in only some, not all, of the instances where a similarly situated private party would be liable to suit. A decision denying Tucker Act relief is not to be read as

 

stating that no other relief is available even when the claim is against the government.

### Conclusion

Accordingly, the judgment of the Claims Court, awarding $575,000 to the appellee City, is reversed and the cause is remanded with directions to enter judgment in favor of appellant.

REVERSED AND REMANDED.