JOHN J. KIRLIN, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 624–84C.

United States Claims Court.

Nov. 25, 1986.

Herman M. Braude, Washington, D.C., for plaintiff; Gerson B. Kramer and Braude, Margulies, Sacks & Rephan, Washington, D.C., of counsel.

David B. Stinson, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant.

## OPINION

MAYER, Judge.

In this direct access suit under the Contract Disputes Act of 1978, plaintiff John J. Kirlin, Inc., challenges the contracting officer's denial of compensation under the Value Engineering Incentive Clause of its contract for work on the Pentagon. Defendant denies entitlement and the case is before the court on cross-motions for summary judgment.

### Background

In 1977, an architect and engineering firm under contract with defendant made recommendations for renovation of the Pentagon. One of the objectives of this contract was to design the renovation of heating and cooling coils contained in the Pentagon's large air handling units. In a tentative submission, the firm suggested "[t]he complete removal of the existing automatic temperature control system relating to control of the 56 major air handling units, and replacement with a new control system including dampers and control air supply system." The firm also proposed the complete removal of the temperature control system and replacement with a new system, to design-in freeze protection for new coils, and to provide an energy conservation report for the Pentagon.

Approximately a year later, in August of 1978, defendant awarded plaintiff a contract for the renovation and improvement of the heating, ventilation, and air conditioning system in the Pentagon. The amount of the contract was $2,374,000, as against defendant's estimated contract price of $3,460,000.

The contract required that plaintiff remove existing outside air damper controls, replace them with new damper motors, and install new air handling unit coils. As designed by the architect, the contract work did not require replacement of the outside air dampers, but it did call for replacement of other dampers in renovating the air handling units and the automatic temperature control system. It consisted of removing and replacing all of the heating coil and cooling coil banks and their associated parts, including automatic temperature controls. The contract also called for plaintiff to modify some of the so-called minimum outside air dampers by blanking them off, but did not require replacement of any of the outside air dampers. Fifty-six face and bypass dampers which were part of the cooling coil banks were replaced by plaintiff.

The contract contained a standard Value Engineering Incentive Clause. On September 21, 1978, plaintiff submitted a value engineering change proposal to the contracting officer pursuant to the clause to replace what are known as maximum outside air dampers on the seventy-six air handling units in the building, with new, low leakage, tight shutoff dampers, "per the standard GSA specification." The proposal recognized the deterioration of the existing outside air dampers and said that the installation of new ones would result in annual energy savings to the government of $1,617,280. The proposal also predicted

significant maintenance savings. Plaintiff estimated the cost of adding the dampers at $203,946.

The value engineering change proposal was sent to the architect and engineering firm by defendant for evaluation. It disagreed with plaintiff's estimate of energy savings, but suggested that the proposal was reasonable and might be advantageous to the government "on the basis of 'preventative maintenance.'" Plaintiff disagreed with the consultant's recommendation. But by letter of December 12, 1978, the contracting officer's representative rejected the value engineering change proposal because plaintiff's estimate of annual energy cost savings was not valid. Nothing was said about the maintenance aspect of the proposal.

By letter of December 20, 1978, plaintiff responded that it "will not be responsible for an operational ATC system unless all the D.A.D. dampers [apparently referring to outside air, return air, and fan inlet dampers] are replaced with new dampers." Defendant replied on December 29, 1978, that it was aware of the deterioration of the dampers and the need for repair or replacement. But it believed that "failure of the dampers to close properly should not affect performance of the renovated systems." Plaintiff protested again on January 19, 1979, writing,

> These dampers as you are aware, are in need of repair and/or replacement. Not replacing or repairing these dampers compromises the operation of the automatic control system and the air balancing. In effect, we will not be responsible for a totally operational and balanced system if these dampers are not corrected.

On February 16, 1979, defendant responded,

> As previously stated in our December 29, 1978 letter, we are aware that these dampers, in some cases, require repair or replacement because they will not close properly. However, their condition does not prevent installation of the specified new automatic temperature control systems. It is not possible for a change order to be issued under this contract to install new direct air dampers. Any repairs or replacement of the existing dampers must be accomplished by Government forces or a separate contract.

Plaintiff completed the contract and executed a release of defendant "from any and all claims arising under or by virtue of said contract or any modification or change thereof except [for a $500 final payment]."

Approximately three months later, defendant issued a project authorization for the replacement of outside air dampers at the Pentagon. The project became part of a contract which was awarded to a contractor other than plaintiff. Whereupon, plaintiff submitted a claim under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601 *et seq.*, alleging that defendant had "constructively accepted" its value engineering change proposal by awarding the subsequent contract. The claim was denied and plaintiff brought suit here. In defense, defendant says plaintiff's proposal to replace outside air dampers at the Pentagon did not qualify as a value engineering change proposal. It was not a variation of existing requirements of the contract, but would have initiated an entirely new area of work. And the cost reduction proposals were not "initiated and developed" by plaintiff. Defendant also says the claim is barred by the release.

### Discussion

In pertinent part, the standard Value Engineering Incentive Clause found in this contract says,

1. INTENT AND OBJECTIVES—This clause applies to any cost reduction proposal (hereinafter referred to as Value Engineering Change Proposal or VECP) initiated and developed by the Contractor for the purpose of changing any requirement of this contract....

1.1 VECP's contemplated are those that would result in net savings to the Government by providing either: (1) a decrease in the cost of performance of this contract, or; (2) a reduction in the cost of ownership (hereinafter referred

to as collateral costs) of the work provided by this contract, regardless of acquisition costs. VECP's must result in savings without impairing any required functions and characteristics such as service life, reliability, economy of operation, ease of maintenance, standardized features, esthetics, fire protection features and safety features presently required by this contract....

The purpose of this clause is to give government contractors incentive to suggest ways of saving the government money through changes in contract specifications. If adopted, the contractor shares the savings with the government according to formulas set out in the clause. Without the clause, changes that would reduce a contract's price would be discouraged because they would also likely reduce the return to the contractor. The clause also prods contractors to look for long-term savings to the government regardless of immediate effect on contract price. *See generally* J. McBride & I. Wachtel, *Government Contracts* § 22.50 (1985).

This case does not concern a saving from a decrease in the cost of performance of the contract as contemplated by subparagraph 1.1(1), because it calls for expenditure of an additional $204,000. It is the so-called collateral costs provision, subparagraph 1.1(2), which plaintiff believes applies because of the significant energy and maintenance savings it envisions from adoption of its suggestion that new outside maximum air dampers be installed. The difficulty with the argument, however, is that while the dampers may have been part of the heating, ventilation, and air conditioning system at the Pentagon, they were not specified as within the scope of the work required by the contract. Plaintiff concedes the latter point, but emphasizes the former one in urging the court to find the Value Engineering Incentive Clause applicable.

■ To satisfy the beneficial purpose of the Value Engineering Incentive Clause, it should be given a generous construction. *Id.* at 22–15. But plaintiff's reading of the clause is too generous. Paragraph 1 says cost reduction proposals must be "for the purpose of changing any requirement of this contract." The proposal here did not change a requirement of the contract, it added a new one. It was not a variation or modification of any contract requirement, but dealt with a component of the concededly integrated system separate from those components on which defendant wanted plaintiff to work. A value engineering change proposal must deal with a duty of the contractor imposed by the contract, *B.F. Goodrich Co. v. United States,* 398 F.2d 843, 847, 185 Ct.Cl. 14 (1968), not a matter which is so far removed from the scope of the work that it could not be reached by a change order under the changes clause of the contract. *Cf., e.g., Edward R. Marden Corp. v. United States,* 442 F.2d 364, 369, 194 Ct.Cl. 799 (1971); *Air–A–Plane Corp. v. United States,* 408 F.2d 1030, 1032, 187 Ct.Cl. 269 (1969); see J. McBride & I. Wachtel, *Government Contracts* § 22.50 at 22–18 (1985).

Plaintiff argues that the deficiencies in the dampers could have jeopardized the newly installed coils because they could freeze up unless the dampers closed tightly. In view of this interrelationship, it urges the court to find that the proposal was within the scope of the contract because new dampers would protect the new coils, and would ensure effective operation of the system. The argument cuts both ways, however. If the contract contemplated that plaintiff ensure the safety of the coils, then arguably it could have been required to replace the dampers at no additional cost to the government if that was the only way to do it. Defendant does not urge this, of course; it says plaintiff "would not be required to do this massive amount of new work simply to protect themselves from cold freeze-up." And plaintiff made clear in its letters of December 20, 1978, and January 19, 1979, that it did not see the dampers as within the scope of the contract and would not be respon-

sible for adverse effects on the system because of the deficiencies in the dampers.

Plaintiff says that because it was required to work on the minimum outside air dampers, the maximum outside air dampers at issue here must also have been includable in the contract. But it is apparent from the papers that the two types of dampers are significantly different. The minimum outside air dampers continually let 10 percent of outside air into the Pentagon for ventilation. The maximum outside air dampers are very large and are used to bring in more outside air for cooling when weather conditions are appropriate. Some of the minimum air dampers were included within the requirements of the contract, primarily because the new system required different adjustments in the amount of air flow in and out of the building. But this had nothing to do with the maximum air dampers.

Within statutory constraints, the government has the same right as any other contacting party to define the work for which it contracts. It can exclude components of a system from the ambit of a contract as it did here for any reason or no reason, wisely or not. The record shows defendant was aware of the condition of the dampers and perhaps would have been prudent to have them replaced under the contract along with the other improvements. Indeed, both during plaintiff's contract and after its completion, at least two officials at the Pentagon identified the same deleterious effects on the system from the deteriorated dampers as plaintiff had cited. The first apparently recognized the inability of the government to add on to plaintiff's contract, and recommended that "[t]he outside air dampers should be replaced after present contract is closed out." The other one did not know why the work had not been done under plaintiff's contract, saying, "Somehow the outside air dampers were not included in [plaintiff's] contract

and it soon became evident that this would cause problems."

But it is not the office of this court to pass on defendant's prudence. Once this contract was awarded without including the dampers, defendant was correct in its February 16, 1979, letter that the only way to then accomplish the work was by using its own forces or by a separate agreement. A change order to plaintiff's contract could not properly have done it, and therefore the Value Engineering Incentive Clause of that contract could not be employed. *Cf. Grismac Corp. v. United States*, 556 F.2d 494, 496, 214 Ct.Cl. 39 (1977). Plaintiff made a noncompensable suggestion. *Id.* Even if it was "initiated and developed" as contemplated by the clause, which the court need not decide, it was accomplished outside the contract, and plaintiff suggests no other authority for defendant to pay for it.*

### Conclusion

Accordingly, it is ORDERED that defendant's motion for summary judgment is GRANTED, plaintiff's cross-motion for summary judgment is DENIED, and the case will be DISMISSED.

---

* In light of this disposition, the court does not reach the question of whether the claim was

foreclosed by the release plaintiff executed.